**MONMOUTH PARK JOCKEY CLUB,**
Appellant,

v.

**Paul D. GUTH, Gilbert Saft and S. Neil Begelman, Executors of the Estate of Samuel Epstein, Deceased, Appellees.**

**No. 19111.**

United States Court of Appeals,
Third Circuit.

Argued Feb. 2, 1971.

Decided April 19, 1971.

---

Matthias D. Dileo, Wilentz, Goldman & Spitzer, Perth Amboy, N. J. (Harold A. Kuskin, Perth Amboy, N. J., on the brief), for appellant.

Jerome R. Richter, Blank, Rome, Klaus & Comisky (Marvin Comisky, Philadelphia, Pa., on the brief), for appellees.

Before McLAUGHLIN and VAN DUSEN, Circuit Judges, and HANNUM, District Judge.

## OPINION OF THE COURT

McLAUGHLIN, Circuit Judge.

The facts here are simple and undisputed. In June and July 1968, Samuel Epstein had a credit arrangement with plaintiff, whereby the latter advanced him various sums which he bet upon the horse races then being run at plaintiff's Monmouth County, New Jersey race track. The cash advances to Epstein were handled by plaintiff's pari-mutuel ticket seller who took care of Epstein's wagering transactions. When Epstein sought to bet, the seller would take the necessary cash from plaintiff's funds and place it in the betting pool of the race chosen by Epstein. After betting two or three races Epstein would write out a check covering the money advanced him. If he won any of his bets the advance to him would be repaid in whole or part from his winnings. If by the end of the track day the advances had not been so repaid, Epstein's checks in due course were deposited by plaintiff for collection.

During the above stated period four of Epstein's checks totaling forty one thousand dollars were given by him to plaintiff for advances in that sum to him by plaintiff. Those checks, issued on the Philadelphia National Bank, were refused payment by the Bank because of lack of funds in the Epstein account. Plaintiff allowed Epstein a credit of $1600 against the checks to which he was entitled, leaving a balance due plaintiff of $39,400.00. None of that balance was ever paid back to plaintiff by Epstein. On September 19, 1968, plaintiff started a suit against Epstein in the United States District Court for the Eastern District of Pennsylvania for the said balance of the money advanced by it to Epstein. The case was listed for trial, etc. On March 11, 1969 Epstein died and his executors were substituted as defendants in this action.

There were motions on behalf of the plaintiff and the defendants for summary judgment. The trial court specifically ruled that "It is admitted that there is no genuine issue as to any material fact." The court then went on to hold that a plaintiff cannot recover on a check given to pay a gambling debt. Its

theory was that " * * * the legislative enactment validated wagering at the track only on a cash basis." The court therefore granted the defense motion for summary judgment and denied the motion for plaintiff.

We are in accord with the agreement of the parties that the New Jersey law governs the merits of the controversy as the trial judge noted. The latter in his opinion soundly stated that "prior to 1940, when the New Jersey Legislature legalized the pari-mutuel system of wagering, a suit based upon a check given in payment of a gambling debt would be dismissed. N.J.S.A. 2A:40–1, 2A:40–3. What happened in 1940 was that the State made a complete turnover as far as horse racing on properly licensed New Jersey tracks was concerned. The 1940 New Jersey statute 5:5–62 specifically provides:

"Any permit holder conducting a horserace meeting under this act may provide a place or places in the race meeting grounds or enclosure at which such holder of a permit may conduct and supervise the pari-mutuel system of wagering by patrons on the result of the horseraces conducted by such permit holder at such meeting, and such pari-mutuel system of wagering upon the result of such horseraces held at such horserace meeting and within such race track and at such horserace meeting shall not under any circumstances, if conducted under the provisions of this act and in conformity thereto, be held or construed to be unlawful, other statutes of the State of New Jersey to the contrary notwithstanding."

It was in accord with that Act and the permit of and constant close supervision of the governing State Racing Commission that plaintiff has ever since the opening of its track by the authority of the 1940 law conducted horse racing there.

Admittedly all of Epstein's bets were made with the plaintiff under the expressly legal pari-mutuel system. Plaintiff was authorized by the law to conduct and supervise the pari-mutuel system [1] of wagering by its patrons. Epstein in the case before us was allowed limited credit wagers as an accepted large bettor. Those bets were completely part of the pari-mutuel system, with the track, as it thought, protected in its cash outlay by the check or checks of the bettor which were given by the latter to plaintiff at least at the close of the bettor's operation for the day. Clearly the transactions were a segment of the pari-mutuel system and within the scope of the 1940 Act. The tight credit extension was a matter of the plaintiff's judgment. The State and Track shares of the wagers did not depend upon whether Epstein won or lost. Nevertheless the unbelievable did happen. The noted checks given by the big bettor were worthless. At the most, plaintiff had made the mistake of permitting one of its most favored customers to make strictly pari-mutuel bets on credit, and financed by plaintiff. Chances are that it will be a long time before plaintiff or any other of the New Jersey tracks backstop the Epstein type of betting.

Pineiro v. Nieves, 108 N.J.Super. 51, 259 A.2d 920 (App.Div.1969), cert. denied 55 N.J. 593, 264 A.2d 66 (1970) involved a problem very much like the one in this appeal. There, a New York State Lottery ticket titled "Carmen Nieves and Family" won $100,000. The daughters of Nieves sued for their alleged part of the money on the basis that they had contributed to the cost of the ticket and that Nieves had agreed they would share equally in the award.

1. Article 4, Sec. VII, ¶ 2 of the New Jersey State Constitution was amended in 1939 to authorize pari-mutuel wagering. The amendment continued to exclude all gambling in the State with the all important added language " * * except pari-mutuel betting on the results of the racing of horses only, from which the State shall derive a reasonable revenue for the support of government."

Nieves moved for summary judgment, as defendant did here, upon the proposition that the agreement was tied into gambling and void by virtue of the New Jersey statutes above mentioned, 2A:40–1 and 3. The lower court granted the motion and the Appellate Division reversed. That court ruled that the New Jersey criminal statutes were amended in 1967 to allow possession of a lottery ticket of another State, provided the ticket was purchased in that State. The court stated that this was to be read in pari materia with 2A:40–1 to the effect that the possession of the ticket by Nieves was presumptively lawful and that receipt of the prize money was also legal. The court further concluded that the factual issue as to those claiming to be within the legend on the ticket could be properly determined.

Pineiro stands strongly for the ruling that New Jersey will uphold participation in a lawful other State gaming transaction. N.J.S. 2A:40–1 and 3 were no defense to the plaintiff's suit in Pineiro. It is obvious that those two statutes are certainly no defense to plaintiff's claim now before us.

Basically the same sort of problem was passed upon by the New York Appellate Division in Cohen v. Iuzzini, 25 A.D.2d 878, 270 N.Y.S.2d 278 (1966). There plaintiff gave defendant the money to buy a twin-double ticket at Yonkers Raceway. Plaintiff brought the action to enforce defendant's agreement to pay him 10 percent of the ticket winnings. The trial judge, as in the court below, granted defendant's motion for summary judgment under provisions of the New York Penal Law. The Appellate Court held that the questions in the matter were "triable issues of fact;" that the Penal Law sections "relating to illegal wagers, have no application to a bet executed at a recognized pari-mutuel track. Under plaintiff's version of the facts—if believed by the trier of the facts—defendant was constituted the agent of the parties to collect the proceeds of the winning ticket and cannot breach his agency by withholding and converting plaintiff's share."

New York has much the same law in Section 991 of its Penal Laws as N.J.S. 2A:40–1 and as in New Jersey, Section 7952 of the N. Y. Unconsolidated Laws provides that " * * * the legislature hereby prescribes that pari-mutuel betting on horseraces shall be lawful in the state if conducted in the manner and subject to the conditions and supervision provided by this act, notwithstanding the provisions of any other law, general, special or local, prohibiting or restricting lotteries, pool seeling or bookmaking, or any other kind of gambling * * *." See also Intercontinental Hotels Corporation v. Golden, 15 N.Y.2d 9, 254 N.Y.S.2d 527, 203 N.E.2d 210 (N.Y. 1964).

Appellee cites some Nevada and California opinions, none of which touches the keystone to the factual problem before us which is N.J.S. 5:5–62. That statute completely covers the case at bar. It is the thoroughly sound, governing law of the State of New Jersey which all agree must be applied.

While we are entirely satisfied that the particular wagering at issue in this appeal is covered by the above referred to law, without any prejudice whatsoever we confine our decision at this time to the facts before us. The judgment of the District Court will be reversed and summary judgment entered for the plaintiff against the defendants in the sum of $39,400.00 plus interest and costs of suit.